# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 06 CR 359-1 |
| | ) | |
| DAVID GROSKY, | ) | The Honorable |
| | ) | Milton I. Shadur, |
| Defendant. | ) | Judge Presiding. |

## DAVID GROSKY'S SENTENCING MEMORANDUM

NOW COMES the defendant, DAVID GROSKY, by and through his attorney, JEFFREY B. STEINBACK, and files this Sentencing Memorandum regarding sentencing issues.

## Background

David Grosky was charged with devising and participating in a scheme to defraud investors and to obtain money and property by means of material false and fraudulent pretenses and misrepresentations, in violation of 18 U.S.C. § 1341 and 1343. The defendant entered a plea of guilty pursuant to a written plea agreement.

As noted in the presentence report ("PSR"), Efoora, Inc. was a company which had two subsidiary companies: Virotek, LLC, which was the manufacturing division; and Prion Developmental Laboratories, which engaged in research and development. (PSR Lines 50-52) The PSR collectively refers to all three companies as Efoora. (PSR Line 52-53) The PSR indicates that Efoora was "in the business of designing, manufacturing, and marketing rapid diagnostic tests." (PSR Lines 53-54)

David Grosky was the Chief Executive Officer of Efoora, Inc., from approximately June 1997 through approximately August 2004, and the Chairman of the Board of Directors of Efoora

from June 1997 to approximately June 2005. (PSR Lines 48-50)

The plea agreement indicates that between 1997 and early 1999, Efoora had less than 200 investors and had raised less than $1 million. (Plea Agreement, page 2) In 1999, the company began to increase its sale of stock. *Id.* Between 2000 and 2004, Efoora had seven stock offerings. (Plea Agreement, page 3) The plea agreement goes on to state:

> Between in or about early 1999 and May 2006, Efoora issued and sold over 100 million shares of its stock, raising over $35 million from investors. There are approximately 5000 shareholders of Efoora; approximately 3000 of those investors purchased stock through Efoora, and approximately 2000 of those investors purchased stock through sources outside of Efoora.
> (Plea Agreement, page 3)

The defendant acknowledges that he made and caused others to make materially false statements to investors and finders in order to convince individuals to invest and in order to help Efoora keep funds already invested. (Plea Agreement, page 3)

### **Application of Principles**

I. <u>The Amount of Loss</u>

In cases involving fraud, the base offense level is increased, as though they are punishment "bonus" points for the Government, based upon the amount of loss, as set forth in Section 2B1.1(b)(1). The guidelines do not present a single universal method of loss calculation under § 2B1.1, nor could they, given the fact-intensive and individualized nature of the inquiry. The guidelines do, however, offer several possible approaches to this calculation. The commentary to § 2B1.1 indicates that "loss" for this purpose is "the greater of actual loss or intended loss." § 2B1,1, cmt. n. 3(A). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1, cmt. n. 3(A)(i). Intended loss is defined as the "pecuniary harm that was intended to result from the offense." § 2B1.1, cmt. n. 3(A)(ii). If the court is unable to determine

2

either actual or intended loss with sufficient certainty, it may rely on the defendant's personal gain from the fraud as an alternative measure of loss. § 2B1.1, cmt. n. 3(B). It is well established that the burden is on the Government to prove by a preponderance of the evidence the amount of loss sustained as a result of the offense. *United States v. Polichemi*, 219 F.3d 698, 714 (7th Cir. 2000).

It is the Government's position that Mr. Grosky's base offense level ought to be increased 22 levels on the belief that the loss in this case is "at least $32 million." (Page 7, Gov. Letter to Probation dated October 17, 2007) In arriving at this loss figure, the Government utilized a simplistic approach. That is, Efoora raised over $35 million from investors between 1999 and May 2006 and, therefore, that is the amount of loss. By arguing that the amount of loss is the nearly the total amount invested, the essence of the Government's position is that Efoora stock was worthless and never had any value. Not only is this not true, but the Government's position is irrational.

In making a loss calculation in a case such as this, we must distinguish between a fraud relating to a "sham" company and a scheme involving an otherwise legitimate company. Prior cases and common sense suggest that a security could be literally worthless after the fraudulent scheme is exposed if the fraudulent scheme involves a "sham" company. If the company whose stock is sold does not legally exist or has no activities, assets, facilities, or any other source of value, that "company" has no underlying equity. Absent highly unusual circumstances, its stock would also be worthless. *See United States v. Mayo*, 646 F.2d 369, 374 (9th Cir. 1981) (purpose of conspiracy involving "sham corporations" was "bilking the unsuspecting public by foisting worthless stock upon it").

Efoora was not a "sham" company. Rather, this is a case in which some potential investors were swayed to invest in a legitimate and viable company as a result of false statements which were made. The plea agreement indicates that the false statements included finder's fees, accredited

investors, stock prices, SEC exemptions, FDA approval of the HIV and glucose tests, Efoora going public, and contracts and revenue. (Plea Agreement, pages 3-4). A significant part of the Government's case concerns the misrepresentations made regarding the imminence of FDA approval for the HIV test. The charges are true. However, the misrepresentation was in predicting rapid approval of the test by the FDA, not in representing that the technology worked. The problems with FDA approval were caused by sloppiness in the trials. In fact, Efoora's current FDA consultant reports that FDA approval remains viable, if sufficient funds can be allocated to correcting the prior consultant's work.[1] Evidence that the HIV test works is also found in the fact that it has been approved for sale in foreign markets. Indeed, the experts in HIV testing believe that the most significant market for the HIV test is the foreign market.

Measurement of loss becomes considerably more complex when the court confronts a scheme involving an otherwise legitimate company. In such a case, because the stock continues to have a residual value after the fraudulent scheme is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock. We further submit that this is not the end of the analysis, however, because "loss" within the meaning of the guidelines includes several other factors. Application Note 3 for Section 2B1.1 states in relevant part:

> **(C) Estimation of Loss**. – The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. 3742(e) and (f).
>
> The estimation of the loss shall be based on available information, taking into account, as appropriate and practicable under the

---

[1] The current leadership of Efoora is proposing to infuse approximately $5 million to continue to develop and market Efoora's diagnostic products.

circumstances, factors such as the following:

    **(i)** The fair market value of the property unlawfully taken or destroyed; or, if fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

    **(ii)** The cost of repairs to damaged property.

    **(iii)** The approximate number of victims multiplied by the average loss of each victim.

    **(iv)** The reduction that resulted from the offense in the value of equity securities or other corporate assets.

    **(v)** More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

**(D) Exclusions from Loss**. – Loss shall not include the following:

    **(i)** Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs.

    **(ii)** Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense.

**(E) Credits Against Loss**. – Loss shall be reduced by the following:

    **(i)** The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

    **(ii)** In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

It is clear that the Government did not take any of these factors into consideration when it submits that the amount of loss in this case is virtually the entire amount of revenue generated through the sale of Efoora stock. We also submit that this court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes. *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007). Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud.

In *United States v. Rutkoske*, 506 F.3d 170 (2nd Cir. 2007), the Second Circuit addressed a strikingly similar case. In *Rutkoske*, the defendant owned a brokerage firm, Lloyd Wade Securities. Lloyd Wade sold stock to retail customers and provided banking services to institutional clients. The indictment for securities fraud, conspiracy to commit securities fraud, bribery and wire fraud stemmed from the firm's involvement with NetBet, a start-up internet gaming company. *Id*. at 172. At trial, the Government presented the testimony of Rutkoske's alleged co-conspirators, some of Lloyd Wade's customers, securities experts, and introduced documentary evidence showing Rutkoske's knowledge of undisclosed commissions earned by his brokers. *Id*. at 173. The court observed that it was not difficult to increase the price of NetBet stock because it was thinly traded and Lloyd Wade controlled the vast majority of shares. *Id.* In addition, the court found that Rutkoske sometimes instructed one of the brokers, Bello, to increase the price. *Id.* The evidence also showed that cold callers sometimes lied to prospective customers, one broker purchased NetBet stock for a client over the client's objection, brokers avoided customers' phone calls when customers wanted to sell NetBet stock, and one broker refused to comply with a client's instruction to sell the stock. *Id.* The evidence also established that brokers selling NetBet stock received large commissions, which Rutkoske personally authorized. *Id*. The commissions were not disclosed to

clients; in fact brokers often told their clients that they received no commission, and trade confirmations stated that there were no commission. *Id*. Rutkoske knew that the firm was hiding commissions. *Id*. Eventually, the price of NetBet shares plummeted and investors lost more than $12 million. *Id*. Rutkoske received a 15-level enhancement in his offense level for loss of more than $10 million upon the court's finding that the loss was $12,057,928. *Id*. at 174.

On appeal, Rutkoske argued that his sentence was unreasonable because the District Court did not properly determine the amount of loss. *Rutkoske*, 506 F.3d at 178. The Court of Appeals agreed with Rutkoske and succinctly held:

> We recently considered the calculation of loss in a criminal stock fraud case in *United States v. Ebbers*, 458 F.3d 110 (2nd Cir. 2006). In *Ebbers*, we acknowledged the complexities inherent in calculating the loss amount but emphasized "[t]he loss must be the result of the fraud." *Id*. at 128. Many factors may cause a decline in share price between the time of the fraud and the revelation of the fraud. *See id.* In some cases, "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id.* In *Ebbers*, however, the total loss was so massive that the loss enhancement would have remained the same had the district court taken into account other causes of the price decline, and remand was therefore unnecessary. *See id.*
>
> The Fifth Circuit, in a case cited approvingly in *Ebbers*, 458 F.3d at 128, looked to principles governing recovery damages in civil securities fraud cases for guidance in calculating the loss amount for a Guidelines enhancement. *See [United States v.] Olis,* 429 F.3d 540, 546 (5th Cir. 2005). **Applying the teaching of the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), the Fifth Circuit stated that "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines" and that the portion of a price decline caused by other factors must be excluded from the loss calculation**. *See Olis*, 429 F.3d at 546; *see also United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) (**"[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."**).

7

*Dura Pharmaceuticals*, on which the Fifth Circuit relied, provides useful guidance. There, the Supreme Court rejected the Ninth Circuit's "inflated purchase price" theory of loss causation, which held that plaintiffs in a civil stock fraud case could establish loss causation simply by showing that the purchase price was inflated because of the defendants' misrepresentation. *See* 544 U.S. at 340, 125 S.Ct. 1627. In rejecting this theory, the Court observed that although an artificially inflated price might cause an investors loss when the investor sells his shares "after the truth makes it way into the marketplace," *id.* at 342, 125 S.Ct. 1627, other factors, such as changed economic conditions, might also contribute to a stock's decline in price, *see id.* at 343, 125 S.Ct. 1627, and a plaintiff must prove that the misrepresentation proximately caused the economic loss, *see id*. at 346, 125 S.Ct. 1627.

The Government contends that the principles set forth in *Dura Pharmaceuticals*, a civil case, should not apply to loss calculation in a criminal case. The dicta in *Ebbers* strongly undermines that position. Moreover, we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence.

Determining the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses inevitably cannot be an exact science. *See Ebbers*, 458 F.3d at 127 ("no easy task"). The Guidelines' allowance of a "reasonable estimate" of loss remains pertinent. And cases might arise where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud. Even there, however, a coincidentally precipitous decline in shares of comparable companies would merit consideration. For example, a fraud disclosed just as the dot-com bubble burst might cause most, but not necessarily all, of the decline in previously high-flying technology stocks. **Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud.**
*Rutkoske*, 506 F.3d at 178-180. (Emphasis added.)

In the case at bar, many factors may have caused a decline in share price between the time of the fraud and the revelation of the fraud. Moreover, the authority discussed above clearly teaches

that "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines" and that the portion of a price decline caused by other factors must be excluded from the loss calculation. In addition, the burden is on the Government to disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes. Here, the Government has not introduced expert opinion and some consideration of the market in general and relevant segments in particular to enable this Honorable Court to approximate the extent of loss caused by the defendant's fraud. Instead, the Government essentially believes that the entire amount invested constitutes the amount of loss. As the above authority establishes, the Government's contention is untenable.

It must also be noted that many of the shareholders were sophisticated investors who invested because they thought that the technology being developed by Efoora had a significant chance of success. These investors understood that Efoora was a startup company and that there was a significant risk involved. On the other hand, it is undeniably true that many shareholders were not sophisticated investors, who did not fully understand the risks and were duped by the false misrepresentations. Parsing the difference between the groups is intricate, difficult, and may be ultimately speculative.

The Government estimates that approximately $35 million was generated through the sale of Efoora stock. However, the Government agrees with the defense that of the approximately 5,000 Efoora shareholders, about 3,000 purchased stock from Efoora and the other 2,000 purchased stock in the active private market outside the control of Efoora or David Grosky.

The analysis can perhaps be broken down into smaller segments. Of the total sales of Efoora stock, our examination of the evidence indicates that about $2-3 million was purchased between

9

1997 and 1999, prior to the fraud period. The PPM (Private Placement Memorandum) sales appears to be approximately $25 million and occurred between 2000 and 2003.[2] The balance of the stock sales were from David Grosky selling his personal stock to fund Efoora. These sales occurred after Efoora stopped the PPM sales and took place between approximately 2003 and 2006.

The PPM sales were conducted pursuant to written offering documents. There were a number of these sales, and thus, a number of PPM documents. However, they were all very similar in content. These documents contained misrepresentations, such as commission payments would not exceed 12%. The misrepresentations concerning commissions will be discussed below. It must be noted that all the PPM documents disclosed that the investment involved a high risk and that investors could lose all of their investment. The PPM also required that the investor be qualified, that is able to independently evaluate the risks and sufficiently wealthy to afford the possibility of losing their investment.

Letters from some of the qualified investors who purchased stock pursuant to the PPMs have been forwarded to this Court. These investors indicate that they recognized the risk of loss, but also recognized that the technology being developed was real, and posed a significant promise. It would be speculative to assign a specific loss amount to the approximately $25 million invested through the PPM sales. On the one hand, it could be argued that the investments were made for exactly the reason stated in the PPM agreements: the investors were willing to risk the loss of their investment

---

[2] The stock market in general declined precipitously during this time period. However, the amount of loss espoused by the Government does not allow for these changed economic conditions which also contributed to the decline in Efoora's stock price. Again, the Government must, but did not, exclude losses brought about by causes other than the fraud.

because they perceived the possibility of a substantial return. On the other hand, it could be argued that the PPM investors were duped, despite the risk disclosure in the PPMs.

As noted above, one of the false statements in the PPMs was that commissions would not exceed 12%. In fact, commissions sometimes reached 35-40% of sales. Thus, it must be conceded that the excess commissions charged over 12% can be charged as a loss for guideline purposes. The accountant for Efoora has been asked about the excess commissions and the accountant reports that commissions did not exceed 12% until 2004. The reason the commissions did not exceed 12% was that a large amount of sales occurred with no commissions, so that, on balance, the commission rate remained under 12%. The PPM sales stopped in 2003. After 2003, there were no known representations made about commission rates. In any event, our reconstruction of the commission payments indicates that the percentage of commissions paid did not exceed 12% of the total sale of Efoora stock over the entire period. In other words, the Government's contention that Efoora was harmed because of the commissions in excess of the 12% was not disclosed is wrong. The statement that commissions were not to exceed 12% was false, because some brokers received a much higher rate. However, the statement did not cause a loss of revenue to Efoora because the sales at less than 12% commission balanced out the sales at more than 12%. The result is that it can be concluded that the commission issue did not cause a loss under the Guidelines.

Remaining is the loss to unqualified investors. These sales were through defendant Mel Dokich. In examining the sales of Dokich, approximately $5.5 million can be traced to about 10 sophisticated investors. We cannot say that the remaining investors were unqualified, but the total dollar amount does not appear to exceed $1.5 million and may be lower.

Between 1997 and approximately 2004, Efoora successfully developed technology for diseases such as HIV/ AIDS and Mad Cow, as well as testing for glucose levels. The bona fides of

11

the technology developed by Efoora has been affirmed by the scientists, such as Kiam Hazijadah, who worked at Efoora, as well as many outside experts who evaluated the Efoora technology. Some of these experts were Efoora shareholders and have written the Court letters affirming the viability of the Efoora technology. The technology has been patented and intellectual property rights remain the property of the Efoora shareholders. The value of the technology is ultimately owned by the shareholders. At this time, it would be speculative to place a firm value on the technology. Evidence of value can be deduced from the parallel civil proceedings where the current leadership of Efoora is proposing to infuse approximately $5 million to continue to develop and market Efoora's diagnostic products. There is great potential for the technology, and at the same time, there is great risk that Efoora will not be able to profit from the technology. Therefore, an assumption that all of the money invested is lost is as speculative as an assumption that the shareholders will ultimately profit.

The Government makes no attempt to satisfy its burden of proof. The Government's position that the amount of loss is between $25 million and $50 million is too speculative and failed to take into consideration certain factors to provide a reliable calculation for sentencing guideline purposes. We add that Mr. Grosky will not go scot free merely because the Government failed to prove the amount of loss to the victims of the fraud. It is simply that the Sentencing Guidelines award bonus punishment points for different levels of proven loss beginning with losses in excess of $5,000. Accordingly, the Government did not earn a 22-point "bonus" in this case. We submit that this Court should find that the amount of loss in this case is between $1.5 million and $2 million.

II. Application of Section 3553(a) Factors

On December 10, 2007, the Supreme Court of the United States decided *Gall v. United States*, ___ U.S. ___, ___ S.Ct. ___ (2007). In *Gall*, the defendant was a second-year college student

12

at the University of Iowa in February 2000 when he accepted an invitation to join an ongoing enterprise distributing ecstasy. At the time, Gall used ecstasy, cocaine and marijuana. During the next seven months, Gall delivered ecstasy pills which he received from other co-conspirators and sold them to consumers. Gall netted over $30,000. A month or two after joining the conspiracy, Gall stopped using ecstasy. A few months after that, in September 2000, Gall advised his co-conspirators that he was withdrawing from the conspiracy. He has not sold illegal drugs of any kind since. He graduated in 2002, and moved first to Arizona, where he obtained a job in the construction industry, and later to Colorado, where he eared $18 per hour as a master carpenter. Gall has not used any illegal drugs since graduating from college.

While in Arizona, federal agents questioned Gall about his involvement in the ecstasy distribution conspiracy, to which Gall admitted his limited participation. No further action was taken at that time. In April 2004, a year-and-a-half after his interview, and three-and-a-half years after Gall withdrew from the conspiracy, he was indicted with seven other individuals. Gall surrendered to authorities, moved back to Iowa, and started his own construction business. Gall entered into a plea agreement in which he stipulated that he was responsible for at least 2,500 grams of ecstasy, or the equivalent of at least 87.5 kilograms of marijuana. The plea agreement also provided that recent changes in the Guidelines that enhanced the recommended punishment for distributing ecstasy were not applicable to Gall because he had withdrawn from the conspiracy prior to the effective date of those changes.[3]

The probation officer found that Gall had no significant criminal history; that he was not an

---

[3] In *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), the Seventh Circuit held that the version of the Guidelines in effect at the time of sentencing should be applied. While the issue was not directly before the Supreme Court, the dicta in *Gall* certainly calls into question the future viability of *Demaree*.

13

organizer, leader, or manager; and that his offense did not involve the use of weapons. Nevertheless, the PSR recommended a sentencing range of 30 to 37 months of imprisonment.

The record of Gall's sentencing included a "small flood" of letters from Gall's parents and other relatives, his fiance, neighbors, and representatives of firms doing business with him, uniformly praising his character and work ethic. The prosecutor did not contest any of the evidence concerning Gall's law-abiding life during the preceding five years, but urged that "the Guidelines are appropriate and should be followed," and requested that the court impose a sentence within the Guidelines range of 30 to 37 months of imprisonment.

The District Court sentenced Gall to probation for 36 months. In his sentencing order, the District Judge wrote:

> The Court determined that, considering all the factors under 18 U.S.C. § 3553(a), the Defendant's explicit withdrawal from the conspiracy almost four years before the filing of the Indictment, the Defendant's post-offense conduct, especially obtaining a college degree and the start of his own successful business, the support of family and friends, lack of criminal history, and his age at the time of the offense conduct, all warrant the sentence imposed, which was sufficient, but not greater than necessary to serve the purposes of sentencing.
> \* \* \* \* \*
> Any term of imprisonment in this case would be counter effective in depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life. The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society. In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life.

The Government appealed and the Court of Appeals reversed and remanded for resentencing. The Eighth Circuit quoted *United States v. Johnson*, 427 F.3d 423, 426-427 (7th Cir. 2005), for the proposition that a sentence outside of the Guidelines range must be supported by a justification that

is proportional to the extent of the difference between the advisory range and the sentence imposed.

The Supreme Court granted certiorari to consider whether a court of appeals may apply a proportionality test and require that a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances. The Supreme Court explicitly rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." The *Gall* Court also rejected "the use of a rigid mathematical formula that uses the percentage of departure as the standard for determining the strength of the justifications required for a specific sentence." In reversing the Court of Appeals, and finding the sentence imposed by District Judge was reasonable, the Supreme Court held:

> As we explained in *Rita*, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . . The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, **the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. See *id*., at \_\_\_. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one**. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing. *Id*., at \_\_\_.See 551 U.S., at \_\_\_.
> *Gall*, \_\_\_ U.S. \_\_\_, \_\_\_ S.Ct. \_\_\_. (Emphasis added)

Pursuant to 18 U.S.C. § 3553(a), the court is required to impose a sentence sufficient, *but not greater than necessary,* to satisfy the purposes of sentencing. (Emphasis added.) Section 3553(a) requires district courts to consider, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need

15

to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to the victims of the offense.

In *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005), the Seventh Circuit held that a district court must first compute the guidelines sentences and then decide whether the advisory guidelines sentence is the correct sentence to give the particular defendant. The *Dean* panel also noted that "Section 3553(a), unlike the guidelines themselves after *Booker*, is mandatory." *Dean*, 414 F.3d at 729. With this in mind our Appellate Court held:

> But the defendant must be given an opportunity to draw the judge's attention to any factor listed in section 3553(a) that might warrant a sentence different from the guidelines sentence, for it is possible for such a variant sentence to be reasonable and thus within the sentencing judge's discretion under the new regime in which **the guidelines, being advisory, can be trumped by section 3553(a), which we have stressed is mandatory**.
> *Dean*, 414 F.3d at 730-31. (Emphasis added.)

The PSR calculates Mr. Grosky's Total Offense Level is 35, with zero criminal history points, placing Mr. Grosky in Category I. (PSR Lines 157, 164-65) Under this calculation, Mr. Grosky faces an advisory guidelines range of 168-210 months. A sentence at the low end of that range, over 14 years, is far greater than necessary to achieve sentencing goals.

  A. Nature and Circumstances of the Offense

Mr. Grosky was convicted of fraud stemming from false representations made concerning Efoora. Mr. Grosky was neither charged nor convicted of stealing money for his own gain. To the contrary, the capital generated through the sale of Efoora stock was used to develop a valuable and worthwhile product that would not only benefit the investors of Efoora, but would also help address serious health problems worldwide. The value of the funds advocated in the PSR and by the Government increases the advisory guidelines range by 22 levels. This pole vault significantly overstates Mr. Gorsky's culpability. A reasonable sentence would not include a 22-level increase

based upon the speculative amount of loss.

B. <u>Mr. Grosky's History and Characteristics</u>

Mr. Grosky is a 46-year-old married man with two children. Mr. Grosky's conviction has, not surprisingly, been devastating to his wife and children. David described having a "difficult home lief as a child." (PSR Line 172) David's sister, Susan Grosky, described Dave as "kind," "good-hearted," and "non-judgmental." (PSR Line 220) The PSR indicates that Susan "explained that the two had a 'very challenging childhood,' from which she cannot recall 'any joyful times.' Susan Grosky indicated that [David] did not receive any praise as a child, and as a result, never developed any sense of self-esteem." (PSR Lines 221-224)

The probation officer wrote the following in Mr. Grosky's PSR:

> [David] has suffered from Obsessive Compulsive Disorder ((OCD), hyperactivity, and anxiety throughout his life. The defendant further reported that between 1998 and 2006 he suffered from gambling and rage addictions. Shortly after filing of charges in this case, the defendant stated that he invested in a few stocks and lost the money, which prompted his wife to contact a counselor specializing in gambling addiction. Since mid-2007, the defendant has been participating in individual and group counseling sessions with Christopher Anderson, whose focus is gambling addictions, and Dr. Corey Goldstein, a psychiatrist. The defendant indicated that he meets with Mr. Anderson twice per week, once for individual and once for group counseling, and Dr. Goldstein once per month.
>
> This officer spoke with Christopher Anderson by telephone regarding his treatment of the defendant. Mr. Anderson confirmed that he has been seeing the defendant in counseling since mid-2007. He indicated that the defendant has suffered from a lifetime of "untreated depression, anxiety disorder, and extreme Attention Deficit Hyperactivity Disorder (ADHD)."
> (PSR Lines 242-254)

Under the heading of Substance Abuse, the probation officer noted that Mr. Grosky had weekly or bi-weekly episodes of binging on alcohol between 1999 and 2007. (PSR Lines 284-285) The PSR also indicates that Mr. Grosky's sponsor, Selby Hussey, confirmed that David has been

17

attending weekly Alcoholics Anonymous (AA) meetings since May of 2007. (PSR Lines 289-291)

As the PSR reflects, Mr. Grosky has never been convicted of a crime. Thus, the likelihood of Mr. Grosky committing further crimes seems virtually nil. By the same token, the need to impose a lengthy sentence to protect the public from further crimes by Mr. Grosky is negligible. Should this Court have any reservations about this possibility, the Sentencing Commission has conducted studies that demonstrate that a person with Mr. Grosky's background poses a low risk of recidivism. The fact that the 46-year-old defendant has no prior convictions places him in the category of those least likely to commit further crimes. *See Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factors Score*, pages 14-15 (January 4, 2005)(suggesting that Criminal History Category I does not adequately take into account the lack of recidivism for first time offenders). Likewise, a defendant, such as Mr. Grosky, who has never before been incarcerated, generally requires a shorter term of imprisonment to achieve the same goal of protecting the public. *See United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006)(upholding District Court's downward departure due to defendant's lack of a criminal history and other considerations, and finding that a prison term would mean more to a defendant who has not previously been imprisoned); and *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D. Wisc. 2005).

In sum, Mr. Grosky is a 46-year-old man with a wife and two children. He is also a man with no criminal history whatsoever. Mr. Grosky has never been incarcerated, and has maintained stable employment his entire adult life. This offense did not involve the use of violence or the possession of weapons. Without doubt, Mr. Grosky is in the category of those least likely to re-offend. A lengthy sentence of imprisonment is far greater than necessary to achieve the goals of sentencing. A sentence below the advisory range would not deprecate the seriousness of the offense,

18

and would provide adequate specific and general deterrence.

## **Conclusion**

We respectfully urge this Court to find that Mr. Grosky's Total Offense Level ought to be level 32 (6 for BOL; +16 for amount of loss; +4 for more than 50 victims; +4 for being an organizer/leader of criminal activity that was otherwise extensive; and +2 for abuse of trust). We further urge this Court to find that a sentence below the advisory guideline range is warranted under the of totality of the circumstances and would represent a sentence which is sufficient, but not greater than necessary, under 18 U.S.C. § 3553(a).

    Respectfully submitted,

    /s/ Jeffrey B. Steinback
    Jeffrey B. Steinback
    Attorney for David Grosky

Jeffrey B. Steinback
53 W. Jackson Boulevard
Suite 1420
Chicago, Illinois 60604
(847) 624-9600